UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

MARK S. PARTAIN,                    )
                                   )
        *Plaintiff*,                )
                                   )        Case No. 1:07-cv-279
v.                                  )        Judge Mattice
                                   )
WAL-MART STORES, INC.,              )
                                   )
        *Defendant*.                )

## MEMORANDUM AND ORDER

Plaintiff Mark S. Partain brings this action against Defendant Wal-Mart Stores, Inc., alleging that the Defendant suspended and then terminated his employment in violation of both the Tennessee Public Protection Act, Tennessee Code Annotated § 50-1-304, and the Tennessee common law prohibition against retaliatory discharge.  Plaintiff also requests that this Court make a determination that Defendant's employment practices in its Vision Centers violate Tennessee statutory law.  Before the Court is Defendant's Motion for Summary Judgment [Court Doc. 21].

For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

## I.      SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from

those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc*., 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material facts exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may bear this burden by either producing evidence that demonstrates the absence of a genuine issue of material fact, or by simply " 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. To refute such a showing, the nonmoving party may not simply rest on its pleadings. *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996); *see Anderson*, 477 U.S. at 249. The nonmoving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute. *Celotex*, 477 U.S. at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

The Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Anderson*, 477 U.S. at 254. Thus, if the plaintiff must ultimately prove his case at trial by a preponderance of the evidence, the Court must, on

motion for summary judgment, determine whether a jury could reasonably find by a preponderance of the evidence that the plaintiff's factual contentions are true. *See id.* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## II. FACTS

The facts, viewed in the light most favorable to the Plaintiff, are as follows.

Plaintiff Mark S. Partain is an optician licensed by the state of Tennessee. (Court Doc. 1-1, Compl. ¶ 1.) From May 2001 to August 2, 2007, Plaintiff was employed by Defendant Wal-Mart Stores, Inc. or, more accurately, Wal-Mart Stores East, L.P.[1] (*Id.* ¶¶ 1, 3.) At the time of his discharge, Plaintiff was a Vision Center Manager at Defendant's store in Athens, TN. (*Id.* ¶ 1.) At all times relevant to this action, Plaintiff's direct supervisor was District Manager David Saddler. (Court Doc. 23-1, Decl. of David Saddler ¶ 1.) The next level of management was Region Manager, first filled by Robert Young and later filled by Rusty Martin. (Court Doc. 22, Def.'s Mem. Supp. Summ. J. ¶¶ 4, 11.) While working as a Vision Center Manager, Plaintiff began to have concerns that Defendant was violating certain Tennessee state laws regulating the dispensing of optical products and services;

---

[1]    Wal-Mart Stores, Inc. is the named defendant in this action; however, Defendant points out in its Motion for Summary Judgment that it has been misidentified and is actually Wal-Mart Stores East, L.P. (Court Doc. 21, Def.'s Mot. Summ. J.)

namely, that Defendant allowed employees who were not licensed opticians to dispense such products and devices, and that supervisors and managers in charge of the Vision Centers were not licensed opticians. (Compl. ¶ 7.) Plaintiff also believed that two of Defendant's programs, called Intercept and Conversion, violated Tennessee laws that prohibited opticians from directly soliciting business for optometrists.[2] (*Id.*) Plaintiff states that he spoke to supervisors and other Vision Center managers about his concerns prior to 2006. (*Id.* ¶ 12.) Most of the communications relevant to this dispute, however, began in October 2006. (*Id.* ¶¶ 12-16.)

On October 3, 2006, Defendant held a regional meeting of Vision Center employees. (Def.'s Mem. ¶ 4.) At this meeting, Robert Young, then-Region Manager for Optical Division, provided employees with copies of relevant Tennessee laws and explained that employees who were not licensed opticians could lawfully dispense products while supervised by a licensed optician. (*Id.*) During a break, Plaintiff and another Vision Center employee called the Tennessee Board of Dispensing Opticians (the "Board") to report that Defendant was violating Tennessee law by engaging in these practices. (Court Doc. 30-5, Affidavit of Mark Partain ¶ 5.) Plaintiff also asked his lawyer to send a letter

---

[2]  The Intercept program is defined as "an opportunity to discuss the importance of eye health with the public and provide general eye health information . . . Vision Center associates will engage people shopping in the stores to talk to them about eye health, including the importance of regular eye exams." (Court Doc. 30-6 p. 31.)

The Conversion program does not appear to lend itself to an easy definition. Defendant's Memorandum describes it as "when an intercept causes a customer to visit the Vision Center." (Def.'s Mem. ¶ 2, fn.1.) This is a simplified version of the description in Robert Young's deposition, but for purposes of this opinion and taking the facts in the light most favorable to the Plaintiff, it is worth noting that Vision Center employees were essentially sent out into the store to solicit business for the Vision Center in every aspect, including scheduling exams for the in-store optometrist. (Court Doc. 23-5, Young Dep. 81-82.)

urging the Board to review Defendant's practices in its Vision Centers in Tennessee. (Partain Aff. ¶ 7.) Plaintiff's lawyer sent such a letter on October 6, 2006. (Court Doc. 1-1 p. 8.) Plaintiff sent his own letter to the Board complaining of Defendant's practices on October 9, 2006. (Court Doc. 30-6 pp. 4-8.) Plaintiff's lawyer sent another letter to the Divisional Manager of Optical in Defendant's home office of Bentonville, Arkansas on October 26, 2006. (Court Doc. 30-6 pp. 2-3.)

Several of Defendant's employees participated in a conference call on October 16, 2006, during which Plaintiff raised his concerns about compliance with state law. (Def.'s Mem. ¶ 6.) As a result of Plaintiff's comments, Defendant contacted the Board to obtain advice about the laws, but the Board told Defendant to obtain its own legal counsel for advice. (Court Doc. 23-4, Spivey Dep. 20.) Defendant did so, and the outside legal counsel confirmed Defendant's interpretation that non-licensed employees could lawfully dispense optical products and services when a licensed optician was present. (*Id.* at 28.) After receiving this advice, Defendant's compliance department sent an e-mail to Vision Center employees on October 31, 2006, outlining acceptable and unacceptable practices under Tennessee law. (Def.'s Mem. ¶ 10.)

Plaintiff questioned the validity of this advice and continued to raise concerns about compliance with Tennessee statutory law. Plaintiff attended and spoke at a continuing education class in November 2006 and informed the participants that Defendant was violating state law by engaging in certain Vision Center practices. (Partain Aff. ¶ 15.) Plaintiff filed a complaint with the Health Related Boards Office of Investigation on January 16, 2007, requesting an investigation into Defendant's practices in the Vision Centers, and filed another complaint on February 23, 2007 after the first was lost. (*Id.* ¶¶ 10-12.)

-5-

Plaintiff attended meetings of the Board on January 17, 2007 and March 26, 2007. (*Id.* ¶¶ 10-13.) At the March meeting, Plaintiff learned that he should petition the Board for a declaratory order, and he later sent the necessary documentation to the Board. (*Id.* ¶ 13; Court Doc. 30-6 pp. 21-28.)

Rusty Martin, the new Region Manager, knew of Plaintiff's complaints to the Board and told Plaintiff more than once during this time frame that he could continue to contact the Board and attempt to obtain advice. (Partain Aff. ¶ 14.) Plaintiff asserted that Mr. Martin did not "encourage" him to contact the Board because he made such remarks "in a taunting fashion." (*Id.*) According to Plaintiff, Mr. Martin said that the Board's decision would have no effect because the Board could not tell Defendant "how to run its business"; in addition, Plaintiff stated that Mr. Martin essentially told him in January or February 2007 that "this type of activity on [his] part would cause [his] career to be short-lived." (*Id.* ¶ 15.) This statement, apparently made on February 19, 2007, is included in a "timeline" e-mail from Mr. Saddler to Mr. Martin detailing problems with Plaintiff over the months at issue in this action. (Court Doc. 30-4.)

Mr. Saddler evaluated Plaintiff's job performance on June 25, 2007. (*Id.* ¶ 16.) Plaintiff received a favorable employment evaluation and an overall score of 4.2, making him an "exceptional performer." (Court Doc. 23-2 pp. 63-65.) On June 27, 2007, Vision Center employees, including Plaintiff, participated in another conference call. (Partain Aff. ¶ 17.) During the call, Plaintiff attempted to discuss his problems with Defendant's position on the legality of the Intercept and Conversion programs. (*Id.*) Mr. Saddler asked him not to address those questions on the call. (*Id.*) Mr. Saddler followed up by requesting advice

from Defendant's Director of Legal and Government Relations for the Optical Division on June 27, 2007. (Court Doc. 23-2 p. 46.) The director, Angie Muldoon, responded to Mr. Saddler on July 12, 2007 and Mr. Saddler forwarded the e-mail to the participants in the conference call, including Plaintiff. (*Id.* at 44-45.)

The following day, July 13, 2007, Plaintiff sent two e-mails to a large number of Tennessee Vision Center employees, including hourly workers, Vision Center managers, District Managers, Region Managers, the Divisional Manager, and the President of the Optical Division. (Partain Aff. ¶¶ 19-20.) In the first e-mail, Plaintiff informed the recipients that he believed the Conversion aspect of the Intercept program violated a Tennessee law that prohibited opticians from directly soliciting business for optometrists and recommended that the other Vision Center employees review the Tennessee statutes referenced. (Court Doc. 23-2 pp. 43-46.) In the second e-mail, sent approximately 30 minutes later, Plaintiff referenced a variety of other Tennessee statutes and informed the recipients of his belief that unlicensed employees violated Tennessee state law by dispensing optical products and services. (Court Doc. 23-2 pp. 47-52.)

Mr. Saddler suspended Plaintiff with pay later that day, purportedly on the advice of Defendant's counsel. (Court Doc. 30-3, Saddler Dep. 58-63.) During the approximately two week suspension, Defendant's corporate office conducted an investigation into Plaintiff's conduct. (*Id.* at 65-66.) Mr. Martin also asked Mr. Saddler to write a "timeline" of problems with Plaintiff, and Mr. Saddler sent him this information in an e-mail dated July 20, 2007. (Court Doc. 30-4.) This e-mail includes entries from October 2006 through July 13, 2007 and almost every entry concerns Plaintiff's complaints about Defendant's practices in the Vision Center. (*Id.*) The result of the investigation into Plaintiff's conduct,

-7-

memorialized on a Performance Coaching Form, was insubordination and "failure to adhere to company direction." (Court Doc. 23-2 p. 66.) After the investigation concluded and Plaintiff's supervisor obtained the results, Mr. Saddler met with Plaintiff on July 31, 2007, they discussed the Performance Coaching Form and, pursuant to Defendant's Coaching for Improvement policy, Mr. Saddler placed Plaintiff on what Defendant calls a "Decision Making Day." (Def.'s Mem. ¶ 6.) Mr. Saddler defined a "Decision Making Day" as "a day that we send out an associate to make a plan of action to address the specific behavior . . . what you're going to do to correct the behavior that you're being coached for." (Saddler Dep. 67-69.)

Plaintiff provided Mr. Saddler with a "plan of action" on August 2, 2007. (Compl. ¶ 5.) Mr. Saddler and Mr. Martin deemed the plan unacceptable because it was too long, did not address changes to Plaintiff's behavior and instead reiterated his concerns about compliance with Tennessee law. (Def.'s Mem. ¶ 6.) Mr. Saddler told Plaintiff that he would need to rewrite his plan of action, and Plaintiff refused. (Partain Aff. ¶ 24.) Mr. Saddler informed Plaintiff that a refusal to rewrite the plan of action would result in termination, and Plaintiff again refused to rewrite the plan. (Saddler Dep. 80-81.) As a result, Mr. Martin made the decision to elevate Plaintiff to the next level in the Coaching for Improvement policy, termination. (*Id.* at 81.) Defendant discharged Plaintiff on August 2, 2007. (Court Doc. 23-2 p. 62.) The Separation Notice states that "[Plaintiff] was sent out on a Decision Making Day and brought a plan of Action Plan [sic]. The action plan was not acceptable. He was given an opportunity to rewrite the Action Plan and he refused which consist [sic] of the next level of coaching. Termination." (*Id.*) Plaintiff's Exit Interview form indicates that Plaintiff was involuntarily terminated for insubordination. (Court Doc. 23-2 p. 61.)

-8-

## III.    ANALYSIS

Defendant claims that it is entitled to judgment as a matter of law because Plaintiff cannot establish a *prima facie* case under either the Tennessee Public Protection Act or the common law tort of retaliatory discharge.  The Court will address each of Defendant's claims separately.


### A.    Tennessee Public Protection Act

Plaintiff claims that Defendant violated Tennessee Code Annotated § 50-1-304, otherwise known as the Tennessee Public Protection Act ("TPPA").  The statute provides in relevant part that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities."  *Id.*  The phrase "illegal activities" is further defined in the statute as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety, or welfare." *Id.*

Plaintiff can establish a *prima facie* claim under the TPPA by proving the following four elements:

> (1) his status as an employee of the defendant employer;
> (2) his refusal to participate in, or to remain silent about, 'illegal activities' as defined under the Act;
> (3) his termination; and
> (4) an exclusive causal relationship between his refusal to participate in or remain silent about illegal activities and his termination.

*Franklin v. Swift Transportation Co.,* 210 S.W.3d 521, 528 (Tenn. Ct. App. 2006) (citing Tenn. Code Ann. § 50-1-304).  The parties agree that Plaintiff can prove the first and third elements because it is undisputed that Defendant employed him and later terminated his

-9-

employment.  Defendant claims, however, that Plaintiff cannot establish a *prima facie* case under the TPPA because Plaintiff did not engage in protected activity to satisfy the second element and Plaintiff cannot prove causation to satisfy the fourth element.  The Court will address these elements in turn.

### 1.  Element Two - Refusal to Remain Silent

In support of its contentions that Plaintiff cannot establish this element of his *prima facie* case, Defendant relies on the language that a plaintiff must "make a report to some entity other than the person or persons who are engaging in the allegedly illegal activities."  *Collins v. AmSouth Bank*, 241 S.W.3d 879, 885 (Tenn. Ct. App. 2007).  Defendant claims that all of Plaintiff's internal complaints should be ignored because they do not qualify as protected activity under the statute.  This quoted language from *Collins*, however, is misleading.  Tennessee case law is fairly clear that the crux of this element is that the employee be furthering a public interest and it does not contain a requirement that the employee complain outside the organization or to a specific authority.  *Id.*; *see also Treadaway v. Big Red Powersports, LLC*, 611 F. Supp.2d 768, 783 (E.D. Tenn. 2009) ("[T]he plaintiff must assert her whistleblowing activity serves a public purpose, not merely a private one.").  The complete passage in which the above-quoted language from *Collins* appears is as follows:

> They must prove that their efforts to bring to light an illegal or unsafe practice furthered an important public policy interest . . . [w]hile they need not report the suspected illegal activities directly to law or regulatory enforcement officials, they must make a report to some entity other than the person or persons who are engaging in the allegedly illegal activities.

-10-

*Id.* (citations omitted). In addition, *Collins* referenced another Tennessee Court of Appeals case that specifically rejected the contention that an employee could not invoke the TPPA by simply reporting to a supervisor. *Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 371 (Tenn. Ct. App. 2005). The *Emerson* court stated that "this Court adopted the reasoning that reporting a serious infraction of the law to either company management or law enforcement officials would qualify." *Emerson*,187 S.W.3d at 371 (citing *Merryman v. Central Parking System, Inc.*, No. 01A01-9203-CH-00076, 1992 WL 330404, at *7 (Nov. 13, 2002 Tenn. Ct. App. 1992)). The *Merryman* court, the first to interpret the TPPA, adopted the reasoning of another state court and determined that the TPPA did not contain any requirement that an employee report activities to an outside entity. *Merryman*, 1992 WL 330404 at *7. Tennessee case law appears to the Court to stand for the proposition that complaining directly to the person engaging in the activity may only be furthering an employee's private interest; however, complaining to multiple people inside the organization–perhaps up the chain of management, perhaps not–may demonstrate that an employee is concerned about an allegedly illegal activity that has an impact on the public welfare. Plaintiff complained to many of Defendant's internal employees up to and including the home office, not only to the direct supervisors who advised him to follow Defendant's interpretation of the state laws. Based on this analysis, the Court declines to ignore Plaintiff's internal complaints in reviewing the facts to support his *prima facie* claim under the TPPA.

Making complaints outside the organization would also satisfy this element, but Defendant contends that Plaintiff's communications to the Board do not qualify because

he was encouraged by Defendant to contact the Board. The Court agrees that the purpose of the TPPA is to "remove an employee from a position of having to choose between reporting workplace illegalities to the proper authorities and remaining employed." *Wooley v. Madison County, Tennessee*, 209 F.Supp.2d 836, 844 (W.D. Tenn. 2002). Defendant uses this language to claim that Plaintiff cannot prove this TPPA element because the fact that he was encouraged to contact the authorities means that he was never placed in such a position. The fact that one or two of Defendant's employees may have encouraged him to contact the Board, however, has little bearing on whether Plaintiff's complaints would constitute protected activity. More importantly, this ignores the many complaints that Plaintiff made before any of the alleged encouragement occurred in February 2007. Plaintiff and another employee called the Board on October 3, 2006. (Partain Aff. ¶ 5.) Plaintiff's lawyer sent a letter to the Board on October 6, 2006. (*Id.* ¶ 7.) Plaintiff sent his own letter on October 9, 2006. (*Id.* ¶ 9.) Plaintiff spoke to a continuing education class in November 2006 and reiterated his concerns at Board meetings in January and March 2007. (*Id.* ¶¶ 10-13.) Finally, there is a factual dispute as to whether Defendant actually encouraged Plaintiff to contact the Board in a way that would remove his complaints from the protection of the statute. According to Plaintiff, the same individual who told him to petition the Board "in a taunting fashion" also said it would make no difference in the way Defendant ran its business and impliedly threatened his job if he continued to raise concerns about compliance with state laws. (*Id.* ¶¶ 14-15; Court Doc. 30-4.)

Plaintiff clearly alleged violations of state law with external complaints to the Board

and with internal complaints to Defendant employees.[3]  These complaints were apparently

motivated, at least in part, by a concern for the public welfare.[4]  Therefore, all of these

communications satisfy the second element and establish that Plaintiff refused to remain

silent about his beliefs that Defendant engaged in illegal activities.  Although there remains

a dispute as to whether Defendant's practices were or are actually illegal, it is unnecessary

to determine the legality prior to deciding if this element is met because "[a]n employee can

---

[3]      As one example, Plaintiff's letter of October 9, 2006 states:

> Another issue of deep concern is the ignorance of, or total disregard for the
> laws governing Tennessee Dispensing Opticians by this new upper
> management.  Through documented intimidation, coercion, and direct
> verbal orders, they have continuously had optical staff fitting, repairing,
> dispensing and selling without a license on premises.  This has been
> happening throughout the state at numerous locations (especially lower
> volume stores) with the full knowledge and approval or upper management.
> . . .
>
> After recent complaints to the home office in late September, there was a
> regional statewide meeting of managers in Gallatin, Tennessee.  At this
> meeting copies of the state laws were passed out along with a document for
> us to sign stating that we had read and understood the law and would follow
> the law in regards to the limits of our job while working under the direction
> of a licensed optician.  And yet none of us are under the direction of a
> licensed optician, we are under the direction of a group of retail managers
> who have never worked or even familiarized themselves with the business
> of optical dispensing!

(Court Doc. 30-6 pp. 6-7.)

[4]      Plaintff's March 2007 petition for a declaratory order states the following:

> Optometrists and ophthalmologists who are required by federal law to
> release their prescriptions to patients, want them to be filled by individuals
> with the proper training and expertise.  They do not want to be wasting their
> time on rechecks of prescriptions because they were improperly filled by
> individuals who have worked in an optical dispensary for a whole two weeks.
> These individuals do not know why the patient can not see well so they just
> send them back to the doctors to let them figure it out.  Employees such as
> these, and there are hundreds of them, make the licensed opticians,
> optometrists, and ophthalmologists seem incompetent.  These violations
> and inexperienced optical employees can and do endanger the health and
> well being of the citizens of Tennessee, of which these laws, rules and
> boards were established to protect.

(Court Doc. 30-6 p. 24.)

-13-

satisfy the second element by showing that she had reasonable cause to believe that her employer had violated a law, regulation, or rule." *Wooley v. Madison County, Tennessee*, 209 F.Supp.2d 836, 845-46 (W.D. Tenn. 2002) (citing *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997)). It appears that Plaintiff had a good faith belief that Defendant's employment practices violated state law. Regardless of the legality of the practices, the Court finds that Plaintiff has satisfied this element because he offered evidence that established a refusal to remain silent about what he reasonably believed were illegal practices.

### 2. Element Four - Causation

Plaintiff has thus satisfied the first three elements of his *prima facie* case; however, it is the fourth element–causation between the refusal to remain silent and the termination–that is most heavily disputed.

Defendant claims that Plaintiff cannot show causation under the TPPA because he cannot prove that his protected activity was the *exclusive* cause of his discharge. In support of this contention, Defendant notes that it took no employment action against Plaintiff from October 2006 until July 13, 2007, even though Plaintiff repeatedly expressed his concerns about the legality of Defendant's practices during that period. (Def.'s Mem. p. 14.) In addition, Defendant claims that Plaintiff's favorable employment evaluation on June 25, 2007 establishes that Plaintiff was not in danger of any employment action, even in light of several months of complaints and reports to internal employees and the Board. (*Id.*) Finally, Defendant alleges that Plaintiff was suspended and later discharged for

-14-

reasons unrelated to his whistleblowing activity; specifically, Defendant states that Plaintiff was suspended because he violated the Open Door Policy and terminated for insubordination because he refused to re-write his plan of action. (*Id.* at 14, 17.) The Court finds that there is a genuine issue of material fact as to whether Plaintiff's complaints of illegal activity were the sole cause for his discharge.

The Court initially notes that this case is somewhat different from other retaliatory discharge cases in that Plaintiff blew a whistle repeatedly over a period of months before any employment action was taken. Defendant claims that this fact undercuts any allegation of retaliatory discharge, but it does not change the analysis. Although it might make a plaintiff's case stronger to point to one particular incident and a discharge shortly thereafter, temporal proximity is not dispositive, and a jury could certainly find that an employee was discharged because of complaints about illegal activity that occurred over a period of time. Defendant's claim that Plaintiff's favorable evaluation on June 25, 2007 supports its contentions is equally unavailing; if anything, it could be viewed as supporting Plaintiff's claims because it shows that there was no job performance-related reason to establish a legitimate ground for termination.

The Court finds that Plaintiff has offered evidence to satisfy this element because the facts establish that Plaintiff's pattern of engaging repeatedly in both internal and external complaints eventually led to his discharge, and these complaints essentially constituted the sole reason for his termination. A jury could infer that Defendant would have taken no employment action whatsoever against Plaintiff if he had never started blowing the whistle on what he believed were illegal activities, regardless of how long the complaints continued or when the termination actually occurred. To provide support for

-15-

the Court's finding in this regard, Defendant's contentions are addressed below.

Although it is unclear if Defendant provided Plaintiff with a reason for his suspension at the time, Defendant now claims that it initially took suspension action against Plaintiff due to the disruptive nature of the two e-mails sent on July 13, 2007 and the violation of the Open Door Policy, not because of his refusal to remain silent about his belief that Defendant was violating Tennessee law. (Def.'s Mem. ¶ 17.) Defendant's so-called Open Door Policy states, in pertinent part:

> All Associates (salaried and hourly) may have Open Door discussions concerning all matters pertaining to Wal-Mart. The purpose of the Open Door is to bring your suggestions, observations, problems, or concerns regarding the Company or yourself to the attention of any supervisor or salaried member of management. . . .
>
> In using the Open Door, faster resolution may occur when the Associate goes through the immediate supervisor first. However, if the Associate feels . . . the problem has not been addressed satisfactorily, the Associate may proceed as outlined below:
> • An Associate may contact the next level of supervision or any other supervisor or salaried member of management, up to and including Senior Management. No formal "chain of command" need be followed.
> • An Associate who wishes to call the Home Office may contact his or her Regional Personnel Manager, People Director, or any level of supervision or management they choose. . . .
>
> The resolution of the Open Door occurs when the supervisor or salaried member of management communicates to the Associate raising the concern the answer or that appropriate disciplinary action has been taken regarding the issue brought forth. . . .
>
> Any supervisor or salaried member of management who . . . [r]etaliates or causes an Associate to be retaliated against for using the Open Door process . . . has engaged in misconduct . . .

-16-

Wal-Mart will take no adverse action against any Associate based solely on the Associate's participation or lack of participation in any Open Door activity.

(Court Doc. 23-2 pp. 53-54.) Defendant asserts that by sending the two e-mails to superiors, peers, and subordinates, Plaintiff violated this company policy because it does not "contemplate[] nor permit[] an Associate . . . to send out emails clearly designed to interfere with the orderly running of business." (Def.'s Mem. p. 14.)

Even assuming that Plaintiff's e-mails were disruptive, however, the fact remains that Defendant does not point to a policy that specifically prohibits Plaintiff's conduct. The Open Door Policy does not address the sending of e-mails and cannot be read as a generalized policy prohibiting employees from disruptive behavior. While it is true that the policy does not explicitly *permit* an Associate to communicate with subordinates, it also does not explicitly *prohibit* an Associate from speaking with peers or subordinates. Furthermore, other than the brief statement that supervisors may be engaging in misconduct if they retaliate against an Associate who attempts to communicate under the policy, there is no provision for punishment of Associates who violate this policy. In fact, the policy has nothing to do with employee conduct, employee behavior, work performance standards, or anything else that might conceivably be viewed as violable or punishable. Therefore, the Open Door Policy offers little support for Defendant's argument that it simply disciplined Plaintiff due to violation of this policy, which could be an acceptable employment action for violating work rules. (Def.'s Mem. p. 15.)

After Plaintiff sent the two e-mails on July 13, 2007 and allegedly violated the Open Door Policy, Defendant chose to suspend Plaintiff with pay and conduct an investigation

-17-

into his conduct.  (Saddler Dep. 63.)  This investigation appears to be part of Defendant's

Coaching for Improvement procedures; according to Defendant's policy for this program,

"[i]nvestigations are a routine part of the coaching process.  It ensures a complete review

of the facts and allows time for proper consideration of appropriate disciplinary action."

(Court Doc. 23-2 p. 56.)  This coaching "occurs when an Associate's behavior (job

performance or misconduct) fails to meet the Company's expectations" and there are four

flexible levels–Verbal Coaching, Written Coaching, Decision-Making Day, and Termination.

(*Id.* at 56-58.)  While Plaintiff was suspended, Mr. Martin asked Mr. Saddler to make a

"timeline" of the problems with Plaintiff.  (Saddler Dep. 39.)  Mr. Saddler sent the timeline

to Mr. Martin on July 20, 2007 and almost every entry, dating from October 2006, concerns

issues with Plaintiff's whistleblowing activity.  (Court Doc. 30-4.)  None of these alleged

problems, however, came up during Plaintiff's employee evaluation in late June.  (Court

Doc. 23-2 pp. 63-65.)

Plaintiff's supervisor contacted him on July 31, 2007, and the two met to discuss the

investigation and resulting Performance Coaching Form.  (Partain Aff. ¶ 22.)  The form

includes the following confusingly worded "observation" of Plaintiff's conduct:

> On July 13th, [Plaintiff] sent an email [sic] his view on the
> Intercept program.  He was not going to do the Intercept
> program that the company had clarification from legal.  The
> concern was forwarded to Angie and responded to and
> [Plaintiff] did not agree with the response.

(Court Doc. 23-2 p. 66.)   The form then states that coaching is necessary for

"[i]nsubordination–failure to adhere to company direction." (*Id.*) After coaching, Defendant

expected Plaintiff to "[f]ollow the company direction when a concern is brought up and

looked into by legal."  (*Id.*)  It is worth noting that this form contains nothing about a

violation of the Open Door Policy or any other company policy; instead, it contains statements that, arguably, improperly characterize Plaintiff's e-mail in a way that would justify a charge of insubordination. Plaintiff's e-mail concerning the Intercept and Conversion program did not state a refusal to continue the program. (Court Doc. 23-2 pp. 43-44.) The e-mail expressed dissatisfaction with the response from Angie Muldoon because her guidance did not address the Conversion aspect of the program and only discussed the legality of Intercepts. (*Id.*) Plaintiff repeated his concerns that the Conversion part of the program violated Tennessee law because it directed Vision Center employees to solicit business for the optometrist in the store and Defendant's practices pushed them to engage in conversions. (*Id.*) Plaintiff also provided reference to the relevant statutes and told the recipients that he was passing the information along so "[y]ou can decide for yourself the true intentions of the intercept/conversion program and if it is compliant with Tennessee State Optician and Optometry Laws." (*Id.*) There is simply no statement in the e-mail that indicates an absolute refusal to carry out the Intercept program and would lead to a charge of insubordination.

Though there is little support for the statements included on the Performance Coaching Form, the results indicated on this form placed Plaintiff on the third level of the coaching process, Decision Making Day, which is the "final opportunity for an Associate to evaluate their behavior in view of Wal-Mart's expectations prior to Termination." (Court Doc. 23-2 p. 57.) The policy acknowledges that coaching can begin "at the appropriate Coaching Level depending on the classification of behavior to be addressed" and there is no documentation that Plaintiff received formal Verbal or Written Coaching on this topic prior to the Decision Making Day. (*Id.* at 56.) When Plaintiff met with Mr. Saddler on July

-19-

31, 2007 to review the results of the investigation, Mr. Saddler informed Plaintiff that he

needed to write a plan of action addressing changes to his behavior. (Saddler Dep. 68.)

Plaintiff provided Mr. Saddler with his plan of action on August 2, 2007. (Partain Aff. ¶ 23.)

Plaintiff's plan of action states, in relevant part:

> I disagree with the finding that I have exhibited insubordination by failing to adhere to company direction. . . . I acknowledge sending an e-mail to my fellow associates providing them with the Tennessee law which makes it unlawful for a dispensing optician to act as the agent or representative of an optometrist and the law which declares that it is unlawful for any person licensed under Tennessee law to canvas or solicit opthalmic materials or optometric services. . . . I acknowledge that in this same e-mail I discussed both the Intercept program and Conversion program and the relation of each to these laws. I did not indicate in my e-mail that I "was not going to do the Intercept program."

> I will continue to participate in that part of the Intercept program which provides an opportunity to discuss the importance of eye health with the public and to provide general eye health information. I will continue to engage people shopping in the stores to talk to them about eye health, including the importance of regular eye exams.

> From review of directives from my supervisors, as a licensed optician, I have been directed not to solicit business for the independent store optometrist and I intend to follow this directive.

> I do want to reiterate my concern that the Conversion program, when considered with the Intercept program, constitutes soliciting business for the store optometrist. . . .

> In closing, I respectfully disagree with the finding of my supervisor that I have been exhibiting insubordination. I perform all of my duties as a Vision Center Manager in good faith, based upon my training and experience to the best of my abilities. I will continue to follow the policies and directives of my supervisors provided the directives and policies do not violate Tennessee law.

(Court Doc. 30-6 pp. 40-41.)

Mr. Saddler and Mr. Martin rejected the plan of action because it "was too lengthy, and it covered a lot of stuff that was in his – the broadcast E-mail, and [] it just needed to address the specific behavior that he was being coached for." (Saddler Dep. 81.) The specific behavior for which Plaintiff was being coached, according to the Performance Coaching Form, was insubordination for refusing to participate in the Intercept program. (Court Doc. 23-2 p. 66.) Plaintiff's plan of action denies that he stated any such refusal, does not contain any current refusal to participate in any of Defendant's programs, and indicates that he will continue to participate in the Intercept program although he has concerns about the Conversion part of the program. (Court Doc. 30-6 p. 41.)

According to Mr. Saddler, what Plaintiff needed to say was that "[h]e would obey directives concerning the intercept program." (Saddler Dep. 81-82.) Plaintiff specifically stated that he would follow all directives from superiors if the directives did not require him to violate Tennessee law. (Court Doc. 30-6 p. 41.) Nonetheless, Mr. Saddler and Mr. Martin rejected what appears to be an acceptable plan of action, Mr. Saddler asked Plaintiff to re-write the plan, and Plaintiff's refusal to rewrite the plan resulted in his termination. (Partain Aff. ¶¶ 23-25.) Plaintiff's Exit Interview form states, "[Plaintiff] refused to rewrite plan of action from D-Day that was unacceptable. The refusal to write the plan goes to the next level of coaching which is termination" and the reason for termination is "insubordination." (Court Doc. 23-2 p. 61.)

Based on the facts presently before the Court, a reasonable jury could determine that it was unreasonable for Mr. Saddler and Mr. Martin to reject Plaintiff's plan of action and that the only plan of action which the Defendant would have found acceptable would

-21-

be one in which Plaintiff would promise to refrain from repeatedly accusing Defendant of violating state laws. This is precisely the situation the TPPA sought to address– that no employee should be in "a position of having to choose between reporting workplace illegalities to the proper authorities and remaining employed." *Wooley*, 209 F. Supp.2d at 844. If Plaintiff had complied and agreed to stop raising concerns about what he believed were Defendant's illegal practices, it is possible–if not likely–that he would still be employed by Defendant. After all, there is no evidence that Plaintiff was ever disciplined or warned for any misconduct or improper behavior outside of his complaints about Defendant's practices.

In fact, the evidence before the Court establishes that Plaintiff was deemed by the Defendant to be an "exceptional performer" as of his June 25, 2007 evaluation. (Court Doc. 23-2 pp. 63-65.) The "timeline" of problems created during his suspension referred almost exclusively to his months of complaints about activities he believed were illegal. (Court Doc. 30-4.) The Court concludes that a reasonable jury could find that everything leading up to Plaintiff's termination, including Defendant's stated reasons for his suspension and termination, were inextricably linked with Plaintiff's whistleblowing activity; that is, there is nothing outside the universe of Plaintiff's complaints that would support his discharge besides the reality that he continually complained about Defendant's activities. Accordingly, the Court concludes that there is a genuine issue of material fact as to whether Plaintiff's whistleblowing was the sole and exclusive cause of his termination.

In summary, the Court finds that Plaintiff can establish a *prima facie* case under the TPPA. The burden now shifts to Defendant to offer legitimate, non-pretextual reasons for the termination, *Wooley*, 209 F. Supp.2d at 845, and Defendant has offered its stated

-22-

reason of insubordination due to Plaintiff's refusal to re-write the plan of action. (Court Doc. 23-2 p. 62.) The burden now shifts back to Plaintiff to prove that Defendant's stated reasons are pretextual. *Wooley*, 209 F. Supp.2d at 845.

For the reasons explained above, there is a genuine issue of material fact as to whether Defendant's claim of discharge for insubordination is pretextual. The evidence surrounding Plaintiff's suspension and discharge, including the rejection of Plaintiff's plan of action, could support a verdict that Defendant's true reason for termination was Plaintiff's whistleblowing activity. Based on the evidence before the Court, it appears that this case will likely turn on the credibility of witnesses. It is the jury, and not the Court, who must determine the facts and assess credibility. Therefore, Defendant's Motion for Summary Judgment [Court Doc. 21] on this claim is **DENIED**.


### B.    Common Law Retaliatory Discharge

Plaintiff also asserts that Defendant discharged him in violation of the Tennessee common law tort of retaliatory discharge, which still exists and can be pled concurrently with a cause of action under the TPPA. *Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 537 (Tenn. 2002). The elements of a common law claim of retaliatory discharge are similar to those of the TPPA, but there are slight differences. To sustain a cause of action under the common law, Plaintiff must show:

> (1) that an employment at-will relationship existed;
> (2) that he was discharged;
> (3) that the reason for his discharge was that he attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and

> (4) that a substantial factor in the employer's decision to discharge him was his exercise of protected rights or his compliance with clear public policy.

*Franklin,* 210 S.W.3d at 528 (citations omitted).

Plaintiff does not specifically plead that this was an at-will employment relationship, but Defendant raises no objection to this characterization and "Tennessee has long adhered to the common law employment-at-will doctrine." *Guy*, 79 S.W.3d at 535. The Court will assume, in the absence of any objection to this element, that an at-will relationship existed. The second element of discharge is clearly established by the facts. Because the Court has already determined that there is a genuine issue of material fact regarding causation under the TPPA, there is most certainly a genuine issue of material fact as to causation under the common law tort, which requires only a "substantial factor" between the whistleblowing activity and the termination. *Franklin,* 210 S.W.3d at 528. Based on the facts before the Court, a reasonable jury could find that Plaintiff's complaints about Defendant's activities were a substantial factor in his discharge.

The only element that would conceivably be in dispute is the third requirement that the employee exercised a right or attempted to comply with a clear public policy. Neither party asserts that this element is in dispute; however, the Court notes that the facts establish Plaintiff's concern for the "health and well being of Tennessee citizens." (Court Doc. 30-6 pp. 21-24.) While Plaintiff's complaints were most likely motivated in part by personal interest in maintaining his optician's license and the integrity of the profession, Plaintiff also expressed concern for the public, their knowledge about eye health, and the potential danger that could result from allowing inexperienced, unlicensed individuals to dispense optical products and services. (*Id.*) Therefore, the Court finds that Plaintiff

-24-

produced evidence to satisfy this element. Because there is no dispute regarding the at-will employment element and Plaintiff has offered evidence in support of all other elements of his common law claim, there is a genuine issue of material fact as to this claim and Defendant's Motion for Summary Judgment [Court Doc. 21] is **DENIED**.

### C. Tennessee Statutory Law

Plaintiff prays in his Complaint that this Court determine that Defendant's employment practices violate Tennessee statutory law. (Compl. p. 7.) Plaintiff further requests that the Court forward such a determination to the Tennessee Board of Dispensing Opticians and "any other applicable regulatory authority." (*Id.*) Defendant urges in its Motion for Summary Judgment that the legality of Defendant's practices is not properly before the Court. (Def.'s Mem. p. 8.) The Court agrees with Defendant that Plaintiff has failed to specifically request a declaratory judgment in his complaint under either state or federal law and notes that Plaintiff had, at the time of this Motion, a declaratory judgment action pending against Defendant in Davidson County Chancery Court. (*Id.* at 9.) The Court also notes that Plaintiff's hearing on his petition to the Board for a declaratory order was scheduled for October 2007 and has presumably concluded. (Court Doc. 30-6 pp. 27-28.)

Although federal courts may exercise jurisdiction and properly issue an advisory opinion under the Declaratory Judgment Act, the United States Court of Appeals for the Sixth Circuit has noted that "[w]e . . . question the need for such declaratory judgments in federal courts when the only question is one of state law and when there is no suggestion

-25-

that the state court is not in a position to define its own law in a fair and impartial manner."
*American Home Assurance Co. v. Evans*, 791 F.2d 61, 63 (6th Cir. 1986).

Plaintiff has not properly plead for a declaratory judgment in this case, and his standing on this issue is questionable in any event, as it is arguable that an actual controversy exists at this time to even warrant an opinion. "An actual controversy is supplied by plaintiffs with a 'personal stake and interest' arrayed against persons with adverse legal interests in a sufficiently immediate adversary context to warrant declaratory relief." *Crossen v. Breckenridge*, 446 F.2d 833, 838 (6th Cir. 1971) (citations omitted). While Plaintiff would argue that he has a personal stake in the outcome of such an opinion as a state-licensed optician, the relationship between Plaintiff and Defendant at this time, in this lawsuit, will not and cannot be resolved by any advisory opinion about Tennessee state law.

As previously discussed, the Court's determination of the legality of Defendant's practices will not be dispositive of Plaintiff's retaliatory discharge claim because Plaintiff need establish only a reasonable belief that the practices are illegal. Plaintiff has satisfied that burden, and this determination would not serve to bring him any additional relief or reinstate him in the Defendant's employ. The Court therefore defers to the Board of Dispensing Opticians and the state court as the more appropriate forums for resolution of Plaintiff's request for interpretation of Tennessee statutes concerning opticians and optical products.

To the extent that Defendant's Motion for Summary Judgment [Court Doc. 21] contains a request that the Court refrain from issuing an advisory opinion on the legality or illegality of Defendant's practices under Tennessee statutory law, that portion of

-26-

Defendant's Motion is **GRANTED**.  The Court declines to exercise jurisdiction and any such claims of the Plaintiff are **DISMISSED WITHOUT PREJUDICE**.


IV.     **CONCLUSION**

For the reasons discussed above, Defendant's Motion for Summary Judgment [Court Doc. 21] is **GRANTED IN PART** and **DENIED IN PART**.


**SO ORDERED** this 15th day of September, 2009.

_____*/s/Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE

-27-